COURT OF APPEALS
DECISION
DATED AND FILED

July 29, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2024AP2484**

**STATE OF WISCONSIN**

Cir. Ct. No.  2024CV730

**IN COURT OF APPEALS
DISTRICT II**

DEMOCRATIC NATIONAL COMMITTEE,

   PETITIONER-RESPONDENT,

V.

HEATHER BOEHM CLERK OF THE CITY OF WHITEWATER,

   RESPONDENT,

REPUBLICAN NATIONAL COMMITTEE,

   INTERVENOR-APPELLANT.

APPEAL from an order of the circuit court for Walworth County: DAVID M. REDDY, Judge. *Reversed.*

Before Neubauer, P.J., Gundrum, and Lazar, JJ.

¶1 GUNDRUM, J. The Republican National Committee (RNC) appeals from an order of the circuit court granting the Democratic National Committee's (DNC) motion to extend the November 5, 2024 election voting hours at the Whitewater—Armory (Armory) and University of Wisconsin Whitewater—University Center (University Center) polling places. For the following reasons, we conclude the court erred in granting the DNC's motion, and we reverse.

## BACKGROUND

¶2 On November 5, 2024, near the end of a hotly contested election for United States President, control of the United States House of Representatives and Senate, and control of state houses around the country, including Wisconsin's, the DNC filed an election-related action in Walworth County Circuit Court either shortly before or after Wisconsin's 8:00 p.m. statewide statutory poll closing time. The motion requested "an order extending polling hours, an ex parte temporary restraining order and/or an order for preliminary injunction" to compel City of Whitewater Election Clerk Heather Boehm to extend voting hours at the University Center and Armory polling locations. (Formatting altered.) In support, the DNC submitted the "Declaration of Evelyn Schmidt,"[1] in which Schmidt declared that (1) she had "been observing the polling place at the … University Center" "[s]ince around 6[:00 p.m.]"; (2) "[t]he polling place has experienced very long lines"; (3) "[t]hese voters need to update their voter registrations, which is the cause of the delay"; (4) "[b]ased on my observations and what I have been told by volunteers, voters who need to update their registrations have needed to wait in line for up to five hours"; (5) "[w]ithin the past few hours, based on my conversations with

---

[1] The motion indicates Evelyn Schmidt is also a petitioner and joined in the motion. While Schmidt submitted a declaration in support of the motion, she is not a named petitioner in the circuit court case nor a named respondent in this appeal.

volunteers, there have been 400-500 voters in line waiting to update their registrations and cast their ballots"; and (6) she was "particularly concerned because the University of Wisconsin–Whitewater has many disabled students, and waiting in line for up to five hours is very difficult given the limited opportunities to sit down while waiting." (Formatting altered.) Schmidt made no declarations related to the Armory polling location.

¶3      The RNC learned of the DNC's action and intervened, and at 9:28 p.m., the circuit court held a hearing on the DNC's motion. After comments by counsel for all parties, the court asked the DNC, "how do you intend to get the word out" if the court were to grant the DNC's request to reopen the Armory and University Center polling places. Counsel for the DNC assured the court that the DNC "ha[s] a communication apparatus," including "text messages to voters," to quickly disseminate such information.

¶4      In determining it had "inherent jurisdiction and authority" to grant the DNC's request, the circuit court referred to an "informational memorandum" of the Wisconsin Elections Commission (WEC), which memorandum neither party presented to the court and the parties apparently were not given an opportunity to review or comment on.[2] The court also referred to WIS. STAT. § 6.96 (2023-24),[3] which details procedures for the marking and preserving of a ballot if a *federal* court were to order that an elector be permitted to vote after the 8:00 p.m. statutory poll closing time. The circuit court ordered that voting be reopened at the University

_____

[2] The memorandum is available online. WISCONSIN ELECTIONS COMMISSION, *Court Document Templates for Extension of Polling Hours*, (Oct. 12, 2018), https://elections.wi.gov/memo/court-document-templates-extension-polling-hours (last visited July 20, 2026).

[3] All references to the Wisconsin Statutes are to the 2023-24 version.

Center and Armory locations, allowing electors assigned to those polling locations to vote until 10:30 p.m., or later if they were in line at that time.[4] The court said it was ruling this way to "err on the side of caution," adding, "[W]hat's the harm." So that ballots cast under its order could be identified in the event of an appellate reversal, the court ordered ballot-marking and -preserving procedures similar to those in § 6.96. The court also said it was "err[ing] on the side of caution allowing voters to vote who wanted to vote but gave up as it were because of the long lines."

¶5 The RNC appeals.

## DISCUSSION

¶6 The RNC asserts the circuit court erred in granting the DNC's injunction request to allow voting at these two polling places past the 8:00 p.m. statutory poll closing time.[5] The DNC counters that we should not consider the

---

[4] Because the circuit court entered its order after the polls had closed, we at times use the word "reopen." Whether an order extending voting time occurs before or after the statewide statutory poll closing time of 8:00 p.m. makes no difference in our analysis. For the reasons explained in this decision, the court did not have the authority to extend voting hours, whether the extension was ordered before or after the polls closed.

[5] The RNC raises the specter of a "violat[ion] [of] the [E]qual [P]rotection clause of the 14th Amendment." While the RNC may have been able to develop this claim into something meritorious, it failed to do so. Because this claim is insufficiently developed, particularly for a constitutional claim, we will not address it. *See Clean Wis., Inc. v. PSC*, 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 (stating that we need not address undeveloped arguments); *see also Wisconsin Conf. Bd. of Trs. of United Methodist Church, Inc. v. Culver*, 2001 WI 55, ¶38, 243 Wis. 2d 394, 627 N.W.2d 469 ("Constitutional claims are very complicated from an analytic perspective, both to brief and to decide…. [W]e cannot allow parties to simply raise the specter of a constitutional violation through insufficiently developed arguments in order to garner an interpretation of a statute in their favor." (quoting *Cemetery Servs., Inc. v. Wisconsin Dep't of Reg. & Licens.*, 221 Wis. 2d 817, 831, 586 N.W.2d 191 (Ct. App. 1998)).

Further, because we reverse on other grounds, we need not address the RNC's additional argument that because the DNC apparently waited until after the polls had closed to file its motion, the doctrine of laches should have barred relief. *See Hegwood v. Town of Eagle Zoning Bd. of Appeals*, 2013 WI App 118, ¶1 n.1, 351 Wis. 2d 196, 839 N.W.2d 111 (recognizing that when the resolution of one issue is dispositive, we need not address other issues raised by the parties).

merits of the appeal because the matter is moot, or alternatively, barred by the doctrine of laches. It also argues that if we consider the merits, the circuit court had the authority to act as it did and appropriately exercised that authority. The RNC is correct; the DNC is not.

## I. Mootness

¶7 Before addressing the merits, we consider the DNC's contention that this matter is moot and, thus, not appropriate for review. The DNC so contends because "[t]he results of the November [2024] election have been certified, all referenda have taken effect, and all winning candidates have taken office—this court's decision will change none of that." We agree this matter is moot for those reasons. However, we may decide the merits of a moot case, as we do here, when the matter is appropriate and worthy of review. Indeed, just a few years ago, our supreme court issued a decision on the merits in an election-related case despite its mootness.

¶8 In *Jefferson v. Dane County*, 2020 WI 90, ¶8, 394 Wis. 2d 602, 951 N.W.2d 556, the petitioners raised an election-related challenge approximately ten days prior to the spring general election involving a highly contested state supreme court race, a presidential primary race, and contests for other offices. Despite apparent mootness, the supreme court nonetheless issued a decision on the merits eight months after the election, stating, "[E]ven in cases where an issue is moot, we may nevertheless reach the merits of the dispute." *Id.*, ¶15. The court explained, as it had many times before, that it is appropriate to do so when

> (1) the issue is of great public importance; (2) the situation occurs so frequently that a definitive decision is necessary to guide circuit courts; (3) the issue is likely to arise again and a decision of the court would alleviate uncertainty; *or* (4) the issue will likely be repeated, but evades appellate review

5

because the appellate review process cannot be completed or even undertaken in time to have a practical effect on the parties.

*Id.* (emphasis added) (quoting *State ex rel. Unnamed Person No. 1 v. State*, 2003 WI 30, ¶19, 260 Wis. 2d 653, 660 N.W.2d 260, and citing *Fine v. Elections Bd. of Wis.*, 95 Wis. 2d 162, 166, 289 N.W.2d 823 (1980)); *see, e.g., Winnebago County v. Christopher S.*, 2016 WI 1, ¶32, 366 Wis. 2d 1, 878 N.W.2d 109 (addressing merits despite mootness); *Outagamie County v. Melanie L.*, 2013 WI 67, ¶80, 349 Wis. 2d 148, 833 N.W.2d 607 (same); *City of Milwaukee v. Washington*, 2007 WI 104, ¶1 n.2, 304 Wis. 2d 98, 735 N.W.2d 111 (same); *State v. Schulpius*, 2006 WI 1, ¶16, 287 Wis. 2d 44, 707 N.W.2d 495 (same); *State ex rel. Riesch v. Schwarz*, 2005 WI 11, ¶12, 278 Wis. 2d 24, 692 N.W.2d 219 (same); *State v. Morford*, 2004 WI 5, ¶8, 268 Wis. 2d 300, 674 N.W.2d 349 (same); *State v. Leitner*, 2002 WI 77, ¶15, 253 Wis. 2d 449, 646 N.W.2d 341 (same); *State ex rel. Angela M.W. v. Kruzicki*, 209 Wis. 2d 112, 120 n.6, 561 N.W.2d 729 (1997) (same). The *Jefferson* court chose to address the issues presented because "[w]ithout correction, the erroneous interpretation and application of WIS. STAT. § 6.86(2)(a)[6], which affect matters of great public importance, are capable of repetition." *Jefferson*, 394 Wis. 2d 602, ¶15. In the case now before us, the first, third, and fourth considerations compel us to decide this appeal despite its mootness.

*A. The issue is of great public importance.*

¶9 Whether a circuit court has the authority to reopen a polling place or otherwise extend voting past the 8:00 p.m. statutory poll closing time, and if so, under what circumstances it can exercise that authority, is of the utmost importance

---

[6] WISCONSIN STAT. § 6.86(2)(a) relates to the automatic delivery of absentee ballots to electors who are "indefinitely confined" or "disabled for an indefinite period."

to election integrity and public confidence in election results. The legislature and governor enacted into law a clear, uniform election-day closing time for polls across Wisconsin, treating electors from all areas of the state equally. A court's order that disregards this clear, uniform law and affords select electors more time to cast ballots than other electors in the state directly undermines the integrity of the election and public confidence. As our supreme court has made clear, "protecting the integrity and reliability of the electoral process, as well as promoting the public's confidence in elections … are always exceedingly important." *Milwaukee Branch of NAACP v. Walker*, 2014 WI 98, ¶73, 357 Wis. 2d 469, 851 N.W.2d 262.

¶10 Here, the circuit court reopened these two polling locations and extended the voting hours after the polls throughout the state had closed, and in doing so, it permitted electors assigned to vote at these two locations more time to cast their ballots than electors anywhere else in the state. It acted not at the request of a neutral elections clerk or an affected elector unable to otherwise vote, but at the request of one of the nation's two most highly partisan organizations (the DNC, with the RNC being the other). The court issued its injunction despite the absence of any evidence indicating voting concerns at the Armory and the thinnest of evidence supporting allegations related to the University Center.

¶11 Until recently, the front page of the website for the DNC stated, "Together, we will elect Democrats up and down the ballot." Democratic National Committee, https://www.democrats.org [https://web.archive.org/web/2026031903 0904/https://democrats.org/]. The "Who we are" button of the website explained that the DNC "is committed to electing Democrats everywhere—from the school board to the Oval Office. We're mobilizing voters across the country." *Id.* The front page invited visitors to provide their email address, phone number, and zip code and informed them that "[b]y entering your phone number, you are consenting

to receive recurring automated text messages & calls from the DNC with news & info about our work," apparently building its "communication apparatus" for "text messages to voters" like counsel for the DNC mentioned to the circuit court in this case. *Id.* Similarly, the front page of the RNC website proudly proclaimed that the RNC was "engaged in a national effort to fight for our proven agenda … and elect Republicans up and down the ballot." Republican National Committee, https://www.rnc.org [https://web.archive.org/web/20260115080259/https://www.rnc.org/].

¶12 It would be pollyannish indeed to believe the DNC and the RNC are expending time, money, and effort to neutrally encourage every elector to vote, regardless of political leanings. Such a belief would be directly contrary to these partisan organizations' avowed missions of, respectively, "electing Democrats everywhere—from school board to the Oval Office" and "elect[ing] Republicans up and down the ballot." *See* Democratic National Committee, https://democrats.org [https://web.archive.org/web/20260319030904/https://democrats.org/]; Republican National Committee, https://www.rnc.org [https://web.archive.org/web/20260115080259/https://www.rnc.org/]. The DNC advances its agenda by getting more voters to the polls who are likely to vote for the DNC's preferred candidates—generally Democratic candidates—and the RNC advances its agenda by getting more voters to the polls who are likely to vote for the RNC's preferred candidates—generally Republican candidates. It is that simple. It is axiomatic that the DNC sought the injunction here to extend the voting hours at the Armory and the University Center not for the neutral and noble goal of equally benefitting all electors in these voting areas, but for the partisan goal of allowing votes to still be cast by those electors it had pre-identified as favoring Democratic candidates. Unlike the circuit courts in other Wisconsin counties where the DNC

8

sought injunctions to extend voting hours on election night, *see infra* ¶¶20-23, the court here granted the DNC's request, and in doing so, compromised the integrity of the election.

¶13 Contrary to the circuit court's "what's the harm" declaration in extending voting hours at these two polling places, the harm to election integrity is significant. As one court has explained,

> commendable zeal to protect voting rights must be tempered by the corresponding duty to protect the integrity of the voting process. Courts should not hesitate to vigorously enforce the election laws so that every properly registered voter has the opportunity to vote. But equal vigilance is required to ensure that only those entitled to vote are allowed to cast a ballot. Otherwise, the rights of those lawfully entitled to vote are inevitably diluted.

*State ex rel. Bush-Cheney 2000 v. Baker*, 34 S.W.3d 410, 413 (Mo. Ct. App. 2000). In short, the "harm" includes illegally cast votes diluting legally cast votes and the loss of confidence of the public in the integrity of our elections. In addition, as we will address later, significant harm was done by the court's decision to allow post-8:00 p.m. ballots to even be cast in the first place, due to the potential legal-political circus that would have been created had the presidential-election results in Wisconsin and the nation been closer in the November 2024 election.

¶14 Whether a state court may extend voting hours at certain polling locations beyond 8:00 p.m., and if so, under what circumstances, is unquestionably a matter of great public importance demanding that we review the circuit court's action in this case with the utmost care. Such care is best provided when legal review is removed from the heat and flames of election night, when the review can benefit from thoughtful briefing and dispassionate consideration of the facts and the law, as has now occurred during the months of this appeal.

¶15    The uniform closing of polls across the state at 8:00 pm. on election night creates a unique opportunity for one party to position itself—with advanced preparation of arguments, statutory and case law support, polished briefing, affidavits and declarants—to file a twelfth-hour surprise action, such as this one, precluding any opportunity for an adverse party to present an equally well-prepared response.  A respondent will not have advanced knowledge of what factual or legal bases the petitioner will present to the court—whether an assertion of "long lines," "administrative delays," "inefficiencies," "hurdles," or a vast possibility of other bases—or in what county such an action may be filed.  The reflexive respondent will have to quickly try to cobble together some marginally adequate response, having virtually no time to gather evidence to counter whatever factual claims a declarant might present to convince a court to extend voting hours in the selected area(s).  Here, the DNC was the only party prepared and poised to present its side of the factual and legal issues, and as it admitted to the circuit court, it also had its "communication apparatus" ready to churn out get-out-the-vote texts to select electors.  To add to that, the DNC's November 5, 2024 legal-political strategy highlighted how all the above concerns can be magnified by a coordinated strategy of filing lawsuits in multiple counties at the twelfth hour, making it even more difficult for a respondent, or intervenor, to prepare an adequate legal response to address a pre-planned, pre-coordinated offensive through the courts.

¶16    Both the DNC and RNC are sophisticated parties with highly aggressive and well-tuned get-out-the-vote operations that allow them to increase the turnout of those electors favorable to their candidates.  Laura MacCleery, *Goodbye Soft Money, Hello Grassroots: How Campaign Finance Reform Restructured Campaigns and the Political World,* 58 CATH. U. L. REV. 965, 972, 994, 996 (2009) (discussing the RNC's "sophisticated direct-mail network" and the

DNC's "voter file" and "huge voter database for get-out-the-vote calls and other persuasion purposes"); David Paul Kuhn, *DNC Blunts GOP Microtargeting Lead,* POLITICO (May 24, 2008), https://www.cbsnews.com/news/dnc-blunts-gop-microtargeting-lead (last visited July 20, 2026) ("Each party compiles hundreds of … data points on one voter, mines the data for patterns and labels a voter on a 1 to 100 scale to measure likely support [and] cross-references phone numbers and addresses for each individual."); Press Release, Democratic National Committee, DNC and ASDC Announces "Organize Everywhere, Win Anywhere" Strategy— Largest-Ever Monthly DNC Investment into Democratic State and Territory Parties (April 24, 2025) https://democrats.org/news/dnc-and-asdc-announces-organize-everywhere-win-anywhere-strategy-largest-ever-monthly-dnc-investment-into-democratic-state-and-territory-parties/ (last visited July 15, 2026) (discussing the DNC's "national voter file with robust augmentations" and the "best-in-class tools for accessing and leveraging that data."); Democratic National Committee, https://democrats.org/dnc-tech/ (last visited July 15, 2026) ("DNC Tech processes, standardizes, and enriches voter files for all 50 states and D.C.  Additionally, the DNC acquires critical data like phone numbers and geocodes that campaigns up and down ballot leverage to effectively reach voters.").  With the presidency and control of the House and the Senate as incredibly significant prizes, the national parties pursue every avenue to harvest additional votes for their preferred candidates. Particularly as a perennial "swing" state, Wisconsin could, on its own, provide the deciding electoral votes that determine which of the two polar opposite and antagonistic parties' candidates will assume the most powerful offices in the world for years, greatly affecting the direction of our nation's policies, foreign and domestic.  The stakes could not be higher.

¶17     As it turned out, within hours after the polls closed on November 5, 2024, it became clear the presidential election in Wisconsin was not close enough to swing Wisconsin's ten Electoral College votes from one presidential candidate (Donald Trump) to the other (Kamala Harris) by use of targeted legal action, as sometimes occurs in close political races. Robert Yoon, *Why AP called Wisconsin and the White House for Donald Trump*, ASSOCIATED PRESS, (Nov. 6, 2024), https://apnews.com/article/trump-harris-wisconsin-president-race-call-winner-explain-d07049f884d25ceae0d1376157d07c35 (last visited July 15, 2026) ("With nearly all of the vote counted early Wednesday, the AP declared Trump the winner of Wisconsin's 10 electoral votes at 5:34 a.m. ET …."); Lawrence Andrea, *Donald Trump wins Wisconsin, propelling his return to the White House*, MILWAUKEE JOURNAL SENTINEL (Nov. 6, 2024), https://www.jsonline.com/story/news/politics/elections/2024/11/06/donald-trump-wins-wisconsin-presidential-vote-in-2024-election/75708195007/ (last visited July 15, 2026). Historically, Wisconsin has had an often razor-thin swing nature. Like Florida immediately following the 2000 presidential election—where "hanging chads" became a household term because George W. Bush appeared on election night to have defeated Al Gore by just a few hundred votes in that state and the resulting electoral votes of Florida alone would determine the fate of the presidential election—2024 Wisconsin similarly could have turned into a highly contentious post-election political-legal battleground. Ford Fessenden and John M. Broder, *Study of Disputed Florida Ballots Finds Justices Did Not Cast the Deciding Vote*, N.Y. TIMES (Nov. 12, 2001), https://www.nytimes.com/2001/11/12/us/examining-vote-overview-study-disputed-florida-ballots-finds-justices-did-not.html (last visited July 15, 2026); *Bush leads Gore by 327 votes in Florida recount, Associated Press reports*, CNN (Nov. 10, 2000), https://www.cnn.com/2000/ALLPOLITICS/stories/11/10/election.president.02/

12

(last visited July 15, 2026). Had the national presidential election (or even a Wisconsin United States Senate race) turned on dozens of Wisconsin votes, the citizens of this state would have seen very clearly "the harm" of the circuit court's order allowing electors to cast tardy ballots at these two polling places.

¶18 Not addressing this issue at this time—after thoughtful briefing and removed from the high-stakes heat of election night—would be a gross dereliction of our duty to the citizens of this state. Now is precisely the time to address these important legal and electoral issues to provide greater clarity for future election-night actions.

*B. The issue is likely to arise again, and a decision of this court would alleviate uncertainty.*

¶19 Great power to significantly affect many people's lives is often at stake in an election. Because of this, there is no reason to believe high-stakes elections will lessen in intensity and combativeness any time soon. Nor is there any reason to believe Wisconsin's status as a swing state will abate any time soon. Political and legal operatives will no doubt continue to use every available avenue to prevail in high-stakes election contests in this state.

¶20 As the DNC explains on appeal, it sought an extension in voting hours at the Armory and the University Center due to "administrative delays," "long lines," and "extensive wait times," which it claimed "*likely* caus[ed] voters to be dissuaded" from voting. (Emphasis added.) Notably, as indicated, Walworth County was not the only area in Wisconsin that the DNC targeted for such legal action on election night.

13

¶21 The DNC filed two other similar actions in Wisconsin alone, one in Dunn County and the other in Winnebago County, in the waning moments of the November 5, 2024 election, both also seeking a judicial order affording extra voting time in targeted areas. According to CCAP, the motion the DNC filed in each case apparently was titled: "Petitioners' Motion for an Order Extending Polling Hours, an Ex Parte Temporary Restraining Order and/or an Order for Preliminary Injunction"—essentially the word-for-word identical title of the motion filed in this case.[7] (Formatting altered.)

¶22 In the Dunn County case, the circuit court held a hearing at 9:24 p.m., just four minutes before the hearing began in the instant case. The clerk's notes from that hearing state as follows:

> Attorney Wachs [second counsel for the DNC] informs the court that throughout the day *the lines were very long*. Asks the court to enter injunctive relief to allow individuals to vote. They asked the city clerk to add an additional voting machine at the location and/or to allow individuals to vote at a less bus[y] ward.

> Attorney Ludeman [counsel for city clerk-respondent Kate Martin] believes that Ms. Martin had *adequate staff* at the locations today.

> Attorney Scott [counsel for RNC] does not believe there has been extraordinary circumstances for individuals to vote today. Individuals who are in line to vote are able to vote. *The request is to re-open the voting polls since the polls have closed*, he does not believe the court has the ability to re-open the voting hours. The court has the ability to extend the hours, but the hours [sic] are closed.

> Attorney Wachs *informs the court that individuals were discouraged to vote due to the long lines* today.

> … WISCONSIN STAT. [§ ]6.78 sets the polling hours, which are from 7:00 a.m. - 8:00 p.m. The court has not seen

---

[7] In the Dunn County case, however, the final word was "hearing" instead of "injunction." Since "hearing," as used in that title, makes little sense, it may have been a simple scrivener's error.

any extraordinary circumstances to permit the polling location additional voting hours. WIS[CONSIN] STAT. [§ ]6.78(4) states that any elector waiting to vote in line prior to 8:00 p.m. shall be permitted to vote regardless if the voting location is closed.

The [c]ourt finds that the [c]ity is doing what they are supposed to do, those in line prior to 8:00 p.m. are permitted to vote as outlined in WIS. STAT. [§ ]6.78. The court is not going to issue an order.

*Democratic Nat'l Comm. v. Martin*, Dunn County Case No. 24CV245 (Nov. 5, 2024) (emphases added). The hearing concluded at 9:32 p.m., and the Dunn County circuit court dismissed the DNC's petition. *Id.*

¶23 In the Winnebago County case, the DNC also sought an order extending the voting hours at select polling places. According to the clerk's notes for the hearing held about one hour after the polls closed across the state, "Petitioner [DNC] is requesting for polls to be reopened …." *Democratic Nat'l Comm. v. Bartlett*, Winnebago County Case No. 24CV1040 (Nov. 5, 2024). As in Dunn County, the circuit court in Winnebago County denied the DNC's request. *Id.*

¶24 Twelfth-hour election night challenges are not just limited to Wisconsin, as several cases cited by the RNC make plain. On November 5, 2002, for example, a day of national and state elections, the Democratic Party of Arkansas filed a petition alleging that numerous voters in the county had been unable to exercise their right to vote due to administrative missteps. *Republican Party of Ark. v. Kilgore*, 98 S.W.3d 798, 798-99 (Ark. 2002). The petition requested immediate action to protect the right to vote, and shortly before the statutorily designated time for poll closure, a circuit court judge ordered that the polling places be kept open for one and one-half hours beyond the designated closing time. *Id.* at 798, 800. On appeal, the Supreme Court of Arkansas determined the circuit court

15

judge had "clearly abused his discretion and exceeded his authority in extending the voting hours":

> Our election law is clear that the polls open at 7:30 a.m. on the day of the election and close at 7:30 p.m. *See* Ark. Code Ann. § 7-5-304 (Repl. 2000). Persons who have presented themselves for voting and who are in line at the polling place to do so when the polls close are permitted to vote. *See* Ark. Code Ann. § 7-5-314(c) (Repl. 2000). The legislative branch of our state government has spoken on this issue, and there is no provision in our Election Code authorizing an extension of voting times by the judiciary.

*Id.* at 800-01.

¶25 On November 7, 2000, the day of the 2000 national election that pitted George W. Bush against Al Gore for the office of president, the Missouri State Democratic Committee, the Gore and Lieberman 2000 Committee, the William L. Clay, Jr. Campaign Committee, and a citizen filed a lawsuit seeking an order to extend voting three hours past the 7:00 p.m. statutory poll closing time. *See Baker*, 34 S.W.3d at 411-12. The basis for the suit was the citizen's claim that he "has not been able to vote and fears he will not be able to vote because of the long lines at the polling places/machine breakdowns in St. Louis, Missouri, that have lasted for several hours." *Id.* at 411. The suit further alleged that "numerous" other voters had been unable to vote due to administrative missteps and that, because of large voter turnout and an insufficient number of polling places, "many otherwise eligible voters will de facto be denied their right to vote." *Id.*

¶26 Despite the relevant Missouri statute providing that electors in line at the 7:00 p.m. poll closing time would be permitted to vote, a circuit court judge ordered the voting hours extended in St. Louis until 10:00 p.m. *Id.* at 412. On appeal, the Missouri Court of Appeals "issued … peremptory writs of prohibition because [the circuit court judge] lack[ed] jurisdiction to extend the hours of voting

16

established by state statute." *Id.* at 412. The appellate court added, "moreover, extension of the hours of voting would only permit voting by persons not entitled to participate and would do nothing to remedy the alleged problems identified in the petition." *Id.* at 412. It further explained that "the courts of this state are obligated to follow and apply the law as written by the legislature" and "[i]t is obviously within the legislature's power to specify the hours in which voters are to cast their ballots." *Id.*

¶27 The *Baker* court also observed that

> pursuant to the second sentence of the statute, anyone in line when the polls close must be permitted to vote. Although the lines may be long and the number of working machines less than desirable, anyone in line at seven o'clock will eventually be permitted to vote no matter how late the hour and their vote will count. If any voters in line at seven o'clock are unwilling or unable to stay and vote, their inconvenience will not be lessened by extending the hours in which new voters can join the line. Extending the hours of voting simply permits voting by persons not entitled to vote due to their failure to come to the polls on time. [The circuit court judge] has no authority to authorize voters who did not come to the polls during the hours established by the legislature to participate in the election.

*Id.* The court added that "allegations that voters stood in long lines for a great length of time and that some voters went home without voting … are plainly insufficient to support an order extending the hours of voting beyond those established by the legislature." *Id.* at 412 n.4.

¶28 On November 5, 1996, the date of the national and state elections that year, the Democratic State Central Committee of Michigan moved for an emergency temporary restraining order and/or preliminary injunction to keep the polls open in certain precincts in the city of Westland, Michigan for three hours past the statutory closing time of 8:00 p.m. *Southerland v. Fritz*, 955 F. Supp. 760, 760-61 (E.D.

Michigan 1996). The Democratic Party asserted that there were lengthy delays in those precincts "apparently caused by the malfunctioning of new polling machines and the fact that the ballot for the election was longer than usual." *Id.* at 761. It argued, as the federal district court phrased it, that "'excessive' lines and delays at the polls had the effect of disenfranchising voters" and "voters' schedules did not allow them the opportunity to wait in line for an extended period of time, nor … afford them the opportunity to return to the polls numerous times throughout the day before the 8:00 [p.m.] closing." *Id.* The city clerk countered that even if it could lawfully extend the hours, an extension was not necessary because Michigan statutory law already provided the remedy to ensure no voter would be denied his or her right to vote, as it provided that "[e]very qualified elector present and in line at the polls at the hour prescribed for the closing thereof shall be allowed to vote." *Id.* (alteration in original; citation omitted). The court agreed with the clerk "that this remedy prevents any voter from being denied the right to vote due to lines or delays at the precinct, and that this remedy is exclusive." *Id.* at 762. The court further noted that even if there was an emergency, "another statutory provision sets forth a procedure for creating and administering emergency ballots should any of the polling machines break down and no reserve machines are available." *Id.*

¶29 We reference the in- and out-of-state cases above to show that the twelfth-hour challenge in this case is hardly a unique, "one-off" situation. Especially with Wisconsin being a key, targeted swing state in high-stakes elections, it is easy to conclude that challenges such as the three the DNC brought in Wisconsin on election night November 5, 2024, are "likely to arise again," *see Jefferson*, 394 Wis. 2d 602, ¶15, and would be much more likely if this court were to abandon its duty to provide clarity on this issue now. Indeed, "without correction," *see id.*, the circuit court's error here is not only capable of repetition but

18

makes repetition more likely as its decision would no doubt otherwise be used to persuade courts in future such election-night actions to follow suit. Despite the November 2024 election being long over, a decision here will provide clarity and help "alleviate uncertainty" in the future. *See **id.***

*C. The issue will likely be repeated but evade appellate review because the appellate review process cannot be completed or even undertaken in time to have a practical effect on the parties.*

¶30 The issue of whether voting hours may be extended past 8:00 p.m. on election day by order of a state court, and if so, under what circumstances, will likely be repeated, yet appellate review in a sufficiently prompt and thoughtful manner will almost never occur. In every case like this, the petitioning party will provide a reason or reasons why the reviewing court should extend voting hours/reopen the polls. Some reasons will sound more compelling than others. Similar to the case the DNC brought in Dunn County, the DNC here presented the common high-turnout election-day problems of administrative delays, long lines, and voter discouragement as reasons for reopening the University Center and the Armory polling places.

¶31 Because problems arising or persisting closer to 8:00 p.m. than 7:00 a.m. on election day are more likely to spawn into legal action seeking to add voting hours, the window for hearing evidence, researching, considering arguments, and creating and delivering a well-reasoned judicial decision is alarmingly short. In this case, the DNC's motion was filed either shortly before or after 8:00 p.m., and the hearing on the motion began at 9:28 p.m., approximately one and one-half hours after the polls in Whitewater—and every other community in Wisconsin—had legally closed, and concluded shortly after 9:37 p.m.

¶32    The question before the circuit court in this case was not just whether votes cast after 8:00 p.m. (except by those standing in line at 8:00 p.m.) and before 10:30 p.m. (or even later if cast by electors who were in line at 10:30 p.m.) should be legally *counted*. The question before the court, as before us now, and the question that would have been before an appellate court November 5, 2024, was whether the circuit court had the lawful authority, based on the circumstances before it, to allow post-8:00 p.m. *casting of ballots* by electors who were not already in line to vote at the 8:00 p.m. statutory closing time. It would not have been possible for the RNC or Boehm to file a meaningful appeal (or even a petition seeking a stay of the circuit court's decision), with sufficiently researched and written briefing, and for an appellate court to adequately address the matter prior to the casting of illegal votes under the circuit court's order extending the poll closing time to 10:30 p.m.

¶33    As the above cases show, it is not a new tactic for the Democratic Party to file lawsuits in the closing hours of high-stakes elections in an attempt to keep polls open longer in targeted areas. As noted, on the night of November 5, 2024, alone, the DNC did so in three separate Wisconsin counties. The recognition that this is not a new tactic further supports our conclusion that we should decide this case on the merits now, despite it being moot. Absent legal guidance from this court, this election-night "voting delays"/"long lines" lawsuit scenario is almost certain to play out again in swing-state Wisconsin. Here, the absence of such guidance prior to the November 2024 election allowed the circuit court to grant the request to extend voting hours past 8:00 p.m. at the University Center and the Armory polling places, while at the same time—quite literally—judges in two other counties followed the statute faithfully and denied the request to extend voting hours for electors in those counties. We must provide guidance.

¶34    Because the issue before us is of great importance, is likely to arise again, will evade meaningful appellate review in a timely manner, and a decision from us will provide greater clarity and certainty and protect the integrity of future elections, as well as the judiciary, we have a duty to address this matter now.

## II. Laches

¶35    The DNC also asserts that the doctrine of laches bars the RNC's *appeal*. This doctrine "ask[s] whether a party delayed without good reason in raising a claim, and whether that delay prejudiced the party seeking to defend against that claim." *Wisconsin Small Bus. United, Inc. v. Brennan*, 2020 WI 69, ¶11, 393 Wis. 2d 308, 946 N.W.2d 101. "In Wisconsin, application of laches is premised on proof of three elements: (1) a party unreasonably delay[ed] in bringing a claim; (2) a second party lacks knowledge that the first party would raise that claim; and (3) the second party is prejudiced by the delay." *Id.*, ¶12. The party seeking application of laches bears the burden of proving each element, but, even if it does so, "application of laches is left to the sound discretion of the court asked to apply this equitable bar." *Id.*

¶36    Here, the DNC encourages us to apply laches not to the filing of this action or the raising of any particular "claim" in circuit court—the DNC filed the action, not the RNC—but in the novel context of the RNC's appeal. Even if laches could be appropriately applied to the RNC's appeal, which question we do not decide,[8] we conclude that the DNC has not sufficiently proven each element.

---

[8] The DNC has directed us to no Wisconsin case in which a court has applied laches in an appeal context.

¶37 Although acknowledging that the RNC initiated this appeal within the lawful time limits, the DNC nevertheless asserts the RNC "unreasonably delayed this appeal" because it did not initiate the appeal until "well after the [election] results were certified." (Formatting altered.) The DNC has not proven unreasonable delay.

¶38 Had it turned out in the hours and days following the closing of the polls on November 5, 2024, that a Republican candidate's election to office could turn on the votes cast by electors who were not in line at either of these polling places when the polls closed at 8:00 p.m. but who nonetheless cast a ballot after that time, it then may have been unreasonable for the RNC not to appeal the ruling of the circuit court immediately. But the DNC has not shown that appealing immediately could have changed the outcome of any election, and the RNC's decision to appeal as it did allows for more thoughtful research, briefing, consideration of the issues, and decision-making. The RNC's choice to appeal on the standard timeline was not unreasonable.

¶39 As to the second and third laches elements—that the DNC lacked knowledge the RNC would "raise that claim," apparently that the DNC lacked knowledge that the RNC would appeal, and that the DNC "is prejudiced by the delay"—the DNC devotes a mere eight sentences, two on the knowledge element and six on prejudice. It persuades on neither element.

¶40 On December 6, 2024, one month after the circuit court's decision, the RNC filed its notice of appeal in this case. The only reason the DNC might not have known the RNC would appeal is if the DNC thought it might not be worth the RNC's time and resources to pursue a challenge to the court's decision after it

became clear no Republican elections would turn on votes cast pursuant to the court's order.

¶41    Equally unpersuasive is the DNC's attempt to convince us it suffered prejudice, as it suffered none. The DNC asserts "the prejudice to voters, candidates, and election officials is clear. Voters may have their ballots invalidated, and election official efforts will be undermined—all months after the fact." The DNC states, *ipse dixit*, that it "is in a 'less favorable position' having to defend this appeal when there is no evidence that providing extra time to vote affected any race or harmed the RNC." This goes nowhere.

¶42    To begin, the laches test asks whether "the second *party* is prejudiced by the delay." *Wisconsin Small Bus. United*, 393 Wis. 2d 308, ¶12 (emphasis added). Neither the voters, the candidates, nor the election officials constitute the "second party" here; the second party is the DNC. Furthermore, the RNC has at no point sought to invalidate any ballots, which, as the DNC points out, would be a moot request at this juncture. Moreover, the statement that "election official efforts will be undermined" is nonsensical, undeveloped and, as indicated, certainly does not constitute prejudice to *the DNC*. Lastly, the DNC fails to explain how it is "in a less favorable position" now than it would have been if the RNC had sought an emergency appeal on election night—when such an appeal at least would have had the potential of precluding the counting of ballots that had been cast after the statutory poll closure.

¶43    But, even if the DNC had proven the elements for laches, which it has not, we would nonetheless exercise our discretion to review this appeal for the reasons we previously discussed for reviewing it despite its mootness. The matter before us is of the utmost importance to ensure election integrity and public

23

confidence, and a decision will provide increased clarity for future election-night litigation.

## III. INJUNCTIVE RELIEF

¶44    The motion the DNC filed in this case specifically stated it was seeking "an ex parte temporary restraining order and/or an order for preliminary injunction." (Formatting altered.)  On appeal, however, the DNC asserts that the circuit court ordered a permanent, not temporary, injunction.  While standards for the granting of the two types of injunctions differ some, *Werner v. A. L. Grootemaat & Sons, Inc.*, 80 Wis. 2d 513, 521, 259 N.W.2d 310 (1977), ultimately, which type of injunction the court ordered is irrelevant because we review both a court's decision granting a temporary injunction and its decision granting a permanent injunction for an erroneous exercise of discretion, *see Kocken v. Wisconsin Council 40*, 2007 WI 72, ¶¶25, 72, 75, 301 Wis. 2d 266, 732 N.W.2d 828; *Werner*, 80 Wis. 2d at 519.  "We … sustain a discretionary determination if 'the circuit court examined the relevant facts; applied a proper standard of law; and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach.'" *Estate of Kriefall v. Sizzler U.S. Franchise, Inc.*, 2011 WI App 101, ¶5, 335 Wis. 2d 151, 801 N.W.2d 781, *aff'd*, 2012 WI 70, ¶82, 342 Wis. 2d 29, 816 N.W.2d 853 (citation omitted); *see also Loy v. Bunderson*, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982).  If a "court errs in deciding a question of law upon which its exercise of discretion rests, the circuit court has erroneously exercised its discretion." *Kocken*, 301 Wis. 2d 266, ¶25.  While a court's decision to grant an injunction is a discretionary one, "[t]he scope of judicial authority is a question of law that this court reviews de novo." *State v. Melton*, 2013 WI 65, ¶22, 349 Wis. 2d 48, 834 N.W.2d 345; *Breier v. E.C.*, 130 Wis. 2d 376, 381, 387 N.W.2d 72 (1986).  The underlying question here is whether the circuit court had the lawful authority in

the first instance to reopen the polling places and extend voting hours past 8:00 p.m. Because the court did not have such authority and it based its order on an erroneous conclusion that it did, it erroneously exercised its discretion in issuing the order.

¶45 In **Breier**, our supreme court reviewed multiple circuit court orders expunging juvenile police records in cases where the delinquency petition against the juvenile had been dismissed. 130 Wis. 2d at 379. The **Breier** court considered whether a circuit court had the authority to order the expunction of juvenile records based on either the statutes, inherent judicial authority, or equitable judicial authority. **Id.** at 381. Similarly, addressing the DNC's asserted sources of authority for the circuit court's order in this case, we consider whether the court had statutory, inherent or equitable authority to extend voting hours past 8:00 p.m.

*A. The Statutes do not authorize the extension of voting hours.*

¶46 WISCONSIN STAT. § 6.78(1m) plainly reads that "[t]he polls at every election shall be open from 7 a.m. *until* 8 p.m." (Emphasis added.) That means, of course, that the polls are *no longer* open after 8:00 p.m.; at "every election," the polls close at 8:00 p.m. *See* WIS. STAT. § 6.96 (referring to "the closing time provided under [§] 6.78"). Immediately after § 6.78(1m) is § 6.78(4) in which the legislature provided that "[a]ny elector waiting to vote, whether within the polling booth or in the line outside the booth at the time the polls officially close, *shall be permitted to vote*." (Emphasis added.) Thus, electors who are not already in line to vote when the polls close at 8:00 p.m. but who instead join or attempt to join the line after 8:00 p.m. *shall not be permitted to vote*. The legislature left no leeway to keep polls open or to reopen them after 8:00 p.m. for tardy voters to then join the line and cast a ballot in an election.

¶47     Underlining the seriousness with which the legislature considered this uniform poll closing time, it even provided a mechanism for assuring no voters arriving at the polls after 8:00 p.m. would be permitted to vote, as it directed that the municipal clerk "shall designate an official … who shall position himself or herself at the end of the line of individuals waiting to vote, if any, at the time that the polls officially close…. *Only* individuals in line ahead of the official shall be permitted to vote under WIS. STAT. [§] 6.78(4)." WIS. STAT. § 7.37(13) (emphasis added). So, in any given election, individuals attempting to join the line to vote after 8:00 p.m. are *not* permitted to vote—the legislature fully intended to preclude such tardy voters from casting a vote in that election.

¶48     Other election statutes further make clear that, other than where a specific exception is provided, such as for persons already in line to vote at 8:00 p.m., the ability to cast a ballot in a given election lawfully ends at 8:00 p.m. on election day. Related to absentee voting, for example, WIS. STAT. § 6.87(6) states:

> The ballot shall be returned so it is delivered to the polling place *no later than 8 p.m. on election day*…. [I]f the municipal clerk receives an absentee ballot on election day, the clerk shall secure the ballot and cause the ballot to be delivered to the polling place serving the elector's residence *before 8 p.m. Any ballot not mailed or delivered as provided in this subsection <u>may not be counted</u>*.

(Emphases added.) So, the legislature wrote that even if the clerk, through no fault of the elector, fails to deliver the elector's vote to the elector's polling place before 8:00 p.m. on election day, the ballot "may not be counted." *See id.* Adding to that, WIS. STAT. § 7.52(1)(a) provides for the canvassing of absentee ballots "received by the municipal clerk *by 8 p.m.* on election day." (Emphasis added.)

26

¶49 The legislature recognized that electors have a responsibility to exercise diligence and timely cast their votes in an election and that at some moment the right to vote in a particular election must end. It determined that time to be 8:00 p.m. for every elector in every election, unless the elector is already in the voting line at 8:00 p.m. By creating a statewide poll closing time of 8:00 p.m., the legislature clearly chose finality, equality, uniformity, and certainty over leeway subject to political gamesmanship and the views or leanings of a single judge in one county, which may differ from those of other judges in other counties.

¶50 Here, the circuit court's reliance on WIS. STAT. § 6.96 in support of its order was erroneous. Section 6.96 specifically details procedures for official handling of an elector's ballot "[w]henever any elector is allowed to vote at a polling place pursuant to a *federal* court order after the [8:00 p.m.] closing time provided under [WIS. STAT. §] 6.78." The legislature did *not* include a similar provision recognizing a possibility of such an order by a state court. The legislature could have easily written "or state" after "federal" and before "court," but it did not.[9] This

---

[9] A Legislative Reference Bureau Drafter's Note from Managing Attorney Jeffery T. Kuesel to the then-administrator of WEC, Kevin Kennedy, indicates that WIS. STAT. § 6.96 was part of a larger legislative effort to, as Kuesel puts it, "implement mandates imposed upon this state under the federal Help America Vote Act." Drafter's Note from the Legislative Reference Bureau (Nov. 26, 2002), https://docs.legis.wisconsin.gov/2003/related/drafting_files/wisconsin_acts/2003_act_265_ab_600/02_ab_600/03_0610_p3dn.pdf. Specifically related to § 6.96, the Drafter's Note states:

(continued)

fact can only support the conclusion that the legislature did not authorize state courts to allow electors to vote after the 8:00 p.m. poll closing time. Section 6.96 explicitly addresses only the circumstance in which a federal court order allows a particular elector or electors to vote after the polls have closed.

¶51     To more strongly emphasize that last point, nothing in even WIS. STAT. § 6.96 provides for the wholesale reopening of a polling place or extension of voting hours. In relying on § 6.96 as supportive, saying that "[sec.] 6.96 provides for an extension of voting hours by court order," the circuit court was "construing the statute contrary to its plain and unambiguous language." *See Breier*, 130 Wis. 2d at 390-91. Section 6.96 unquestionably does not "provide[] for an extension of voting hours by court order," which would entail keeping the polls open longer for *all electors* assigned to vote at a particular polling place or places. Instead, the statute provides specific procedures on marking and preserving ballots when a federal court orders that a particular elector or electors be permitted to cast a ballot after the polls have closed to all other general electors.

¶52     As indicated, WIS. STAT. § 6.78 clearly provides that all polls in the state close at 8:00 p.m. on election day. Unless a federal court orders that a

---

> In proposed [§] 6.96, I did *not* make provision for the marking of ballots issued pursuant to a *state* court order for extended polling hours because *there is no statutory authority for such an order to be issued*. If you want to require marked ballots for voting conducted under a state court order, I would first address the issue of who would be permitted to issue such an order and under what circumstances. Because it is fairly easy to find a friendly circuit judge in some areas and because there is a potential for improper influence when a court acts without a full adversarial hearing, I would approach this issue with some caution. This is not to indicate that there aren't a few extreme situations where extended hours might be justifiable.

Drafter's Note from the Legislative Reference Bureau (Nov. 26, 2002) (emphases added).

particular elector or electors be permitted to vote after that closing time, an elector may only cast a ballot after 8:00 p.m. if the elector is already in line when the polls close at 8:00 p.m. The statutes do not allow for a state court to permit any elector who was not already in the voting line at 8:00 p.m. to cast a ballot after 8:00 p.m., much less to reopen polling places or otherwise extend voting hours for completely new electors—some of whom may never have even approached their polling place prior to 8:00 p.m.—to enter the voting line and cast ballots. The circuit court did not have statutory authority to reopen the two polling places to extend voting hours past 8:00 p.m.

*B. The circuit court did not have inherent authority to extend voting hours.*

¶53 Ultimately, the circuit court based its order reopening the University Center and the Armory polling places and extending voting hours on its erroneous belief that it had "inherent jurisdiction and authority" to issue such an order. The court apparently believed it had this authority based on the DNC's claim that "long lines," potentially contributed to by administrative "delays," may have discouraged some electors earlier in the day and caused them to leave the line without voting. The court had no such authority.

¶54 The circuit court cited no case law suggesting it had the inherent authority to ignore the clear, statewide statutory poll closing time of 8:00 p.m. and reopen the polls at these two locations. Notably, even after months to research and brief the matter, the DNC has developed no argument based upon any controlling (or even persuasive) authority that the circuit court here had "inherent authority" to reopen the polls at these locations and create a "long lines" or "administrative delays" exception to the statewide closing time provided in WIS. STAT. § 6.78.

¶55     The DNC does make very brief reference to *State ex rel. Friedrich v. Circuit Ct. for Dane Cnty.*, 192 Wis. 2d 1, 531 N.W.2d 32 (1995), but *Friedrich* only shows why the circuit court here *lacked* inherent authority to reopen the polling places and extend voting hours.

¶56     In *Friedrich*, our supreme court considered whether it was the legislature or the courts that had ultimate authority to set the rates of compensation for court-appointed guardians ad litem and special prosecutors. *Id.* at 16. The court concluded that, although this was an area of shared powers between the two branches of government, the courts have the ultimate authority to set the rates of pay for such attorneys. *Id.* at 10. The court explained that courts have "inherent, implied and incidental powers," which are "'powers which must necessarily be used' to enable the judiciary to accomplish its constitutionally or legislatively mandated functions." *Id.* at 16 (citation omitted). The court stated that courts have the inherent authority to set rates for court-appointed attorneys because courts have the "duty and *inherent power to* preserve the integrity of the judicial system, *to* ensure and if necessary to provide at public expense adequate legal representation, and *to* oversee the orderly and efficient administration of justice." *Id.* at 10 (emphases added). The court added that "[a] court's inherent power to compensate court-appointed attorneys is necessary to preserve the judiciary's constitutional duty to oversee the administration of justice" and "appropriate compensation helps ensure that the tasks for which counsel is appointed are competently carried out." *Id.* at 19. Inherent power to determine and order appropriate compensation for court-appointed counsel "is necessary for the effective operation of the judicial system." *Id.* at 20; *see also* *State v. Darling*, 143 Wis. 2d 839, 844, 422 N.W.2d 886 (Ct. App. 1988) ("The doctrine of inherent power is founded on the principle of granting to the courts the necessary powers to properly function."); *State v.*

*Braunsdorf*, 98 Wis. 2d 569, 579, 297 N.W.2d 808 (1980) (explaining that a court has "inherent power to protect itself against any action that would unreasonably curtail its powers or materially impair its efficiency" (citation omitted)); *Latham v. Casey & King Corp.*, 23 Wis. 2d 311, 314, 127 N.W.2d 225 (1964) ("Every court has inherent power, exercisable in its sound discretion, consistent within the Constitution and statutes, to control disposition of causes on its docket with economy of time and effort." (citation omitted)).

¶57     As our supreme court further explained in *State v. Schwind*, 2019 WI 48, ¶15, 386 Wis. 2d 526, 926 N.W.2d 742, the inherent authority of the court refers to "[a] power … without which a court cannot properly function." (Alteration in original; citation omitted.) "Wisconsin courts have generally exercised inherent authority in three areas: (1) to guard against actions that would impair the powers or efficacy of the courts or judicial system; (2) to regulate the bench and bar; and (3) to ensure the efficient and effective functioning of the court, and to fairly administer justice." *Id.*, ¶16 (citation omitted). As the *Schwind* court further stated, "courts exercise inherent authority when necessary to allow them to function as courts." *Id.*, ¶19.

¶58     The issue in the case now before us does not relate in any way to the circuit court's own ability to function as a court. As *Friedrich*, *Schwind*, and the other cited cases make clear, inherent powers of the courts relate to their ability to administer the court system itself. This case has nothing to do with that. Instead, the instant case concerns the administration of Wisconsin's *election* system, an area traditionally and intricately regulated by the legislature. Contrary to the circuit court's apparent belief here, it did not have inherent authority to extend voting hours.

31

*C. The court did not have equitable authority to extend voting hours.*

¶59    The DNC also claims the circuit court had equitable authority to issue its order. Because this claim is undeveloped, we need not consider it. ***Raasch v. City of Milwaukee***, 2008 WI App 54, ¶8, 310 Wis. 2d 230, 750 N.W.2d 492 (recognizing that an appellate court need not address undeveloped arguments). That said, we nonetheless do.

¶60    For its claim that the circuit court had equitable authority, the DNC, without any analysis, relies upon a few quotes from our supreme court's decision in ***Breier***, 130 Wis. 2d 376, but this case provides it no assistance.

¶61    In considering whether a statute "requir[ing] juvenile police records be kept confidential" "impliedly confer[red] equitable authority" upon a circuit court to expunge juvenile police records, the ***Breier*** court stated, "[c]onfidentiality … is not equivalent to expunction. In fact, confidentiality requires that the records be maintained and used for defined purposes. If we construed [WIS. STAT. §] 48.396(1) to authorize expunction, we would be construing the statute contrary to its plain and unambiguous language." ***Breier***, 130 Wis. 2d at 390-91.

¶62    The ***Breier*** court considered whether a circuit court had "equitable authority" to expunge the juvenile police records, *id.* at 388, "agree[ing] that a circuit court … has authority to grant equitable relief, even in the absence of a statutory right," *id.* at 388-89. The court emphasized, however, that such relief "must be in response to the invasion of legally protected rights." *Id.* at 389. "The exercise of equitable authority, therefore," the court continued, "may provide complete justice *only where there is a wrong*." *Id.* (emphasis added). The court stated that to "sanction expunction as an appropriate equitable remedy," it needed to determine "that the maintenance by police of juvenile arrest records *violates* a

recognized right." *Id.* (emphasis added). The court concluded that the "maintenance of juvenile arrest records by police d[id] not violate any recognized rights of the juveniles," and, therefore, expunction was not an appropriate equitable remedy. *Id.* at 389-90.

¶63 In the case now before us, the factual record presented to the circuit court did not suggest an invasion of anyone's rights, and there was no "wrong" to be corrected. To begin, as stated, no evidence was presented to the court that electors actually left the voting line at either polling location due to the long lines. But even if there had been such evidence, significantly, all electors at these two polling places were afforded the same amount of time to cast their vote on election day as all other electors in the state. Furthermore, like all other electors, they had weeks prior to November 5, 2024, to cast their votes. If they failed to avail themselves of that opportunity and their polling place was never actually closed to them when they arrived to vote on election day, their failure to cast their vote by 8:00 p.m. that day, or at least be in line to do so by 8:00 p.m., is their fault and theirs alone. Moreover, as noted throughout this decision, the legislature here (as in the other states noted) has built in a remedy that allows every elector to vote no matter how long the lines—electors will be allowed to vote so long as they are in line by 8:00 p.m. There was no inequity underpinning the circuit court's decision in this case. The plain language of WIS. STAT. § 6.78—which language is fair and equal for all in the state—will not be subverted by extending voting hours on the basis

that the court did so here.[10] Here, no electors assigned to vote at either of these two polling places were denied the opportunity to vote. Instead, the circuit court's order inequitably provided them *greater* opportunities than others in the state.

¶64 The circuit court granted the injunction here based upon its findings that the University Center and Armory polling locations "experienced significant delays due to inadequate staffing and insufficient numbers of BadgerBooks due to unprecedented turnout on November 5, 2024" and that "voters … who wanted to vote … gave up … because of the long lines." Notably, the DNC presented no evidence to the court that supported these findings, and thus the court clearly erred in making them. *See **State v. Black***, 2001 WI 31, ¶9, 242 Wis. 2d 126, 624 N.W.2d 363 ("[T]his court will find an [erroneous exercise] of discretion if the record shows that … the facts fail to support the [circuit] court's decision …." (third alteration added; citation omitted)). The only source of evidence before the court—Schmidt's declaration—does not support the court's factual findings. Nor was there a reasonable basis for the court to infer that because voting lines may have been long, electors who had adjusted their daily schedules to go to the polls in the first place did not remain in line until they had completed voting. Instead of supportive evidence, the court appears to have relied on *argument* presented by counsel for the DNC in support of its motion.

---

[10] In her declaration, Schmidt states she was "particularly concerned [about the long lines for voting] because the University of Wisconsin Whitewater has many disabled students, and waiting in line for up to five hours is very difficult given the limited opportunities to sit down while waiting." It must be noted that this, the only "evidence" related to disabled students, provides no evidence whatsoever that a single disabled elector was even in a line to vote under Schmidt's observations, much less that such an elector might have chosen to exit the line and not vote due to its length. For all we know from the record, any disabled electors who might have had a particular difficulty with waiting in lines may well have availed themselves of the opportunity to vote by absentee ballot during the weeks prior to the election.

¶65    As relevant, Schmidt's declaration states no more than the following. She had been observing a single polling place, the University Center, "[s]ince around 6[:00 p.m.] CT on election day, November 5, 2024," which "has experienced very long lines." "These voters," declared Schmidt,

> need to update their voter registrations, which is the cause of the delay…. [V]oters who need to update their registrations have needed to wait in line for up to five hours.
>
> Within the past few hours, based on my conversations with volunteers, there have been 400-500 voters in line waiting to update their registrations and cast their ballots.

¶66    Schmidt's declaration does not mention the Armory, and the DNC presented no other evidence of any kind related to the Armory. As a result, the circuit court's order with respect to the Armory constituted an erroneous exercise of discretion on that basis alone. *See **Black***, 242 Wis. 2d 126, ¶9. Additionally, as to the University Center, there was no evidence before the court that any "delays" in the voting process at that location were due to "inadequate staffing." Schmidt's declaration states that the "very long lines" and "delay[s]" were caused by the need for electors "to update their voter registrations." Even assuming this to be true, the court clearly erred in finding that voting delays were caused by inadequate staffing, as there was no evidence before it as to what the staffing levels even were at the polling site or what levels would have been "adequate." The court's finding was not a reasonable inference but speculation that staffing levels were inadequate. Moreover, the court's determination that the delays were sufficient to warrant disregarding the plain language of the statute was arbitrary and standardless. The court did not set forth a basis for determining how long of a voting line is "too long" or long enough to provide a legal basis for ignoring the statutory poll closing time.

¶67    Further, there was no evidence presented to the circuit court that in any way related to "BadgerBooks," much less evidence as to what these items are, what role they play in the voting process, and thus how they were relevant to the issue before the court. Because there was no evidence at all related to BadgerBooks, there was then also no evidence as to what would have been a sufficient number of such items to support the court's finding that there were "insufficient numbers of BadgerBooks." The court clearly erred with this finding as well. Furthermore, it may well be that the turnout at these two polling locations was "unprecedented" on November 5, 2024—as such unprecedented turnouts often occur during a presidential election—but the DNC presented no evidence to the court that would support this finding. The court clearly erred with this finding as well.

¶68    And lastly, the circuit court's ultimate reason for reopening these two polling locations and extending the voting hours appears to be electors "who wanted to vote but gave up … because of the long lines." But, again, the record contains no factual support for finding that *any* electors "gave up" and chose not to remain in line to cast their ballots. There was zero evidence of a single elector who arrived at one of these two polling locations during the hours of voting on November 5 but chose to "give up" rather than wait in line to cast his/her vote. Such speculation was only offered by counsel for the DNC during argument at the hearing, and even then, the argument highlighted the speculation and lack of evidence: "[E]lectors and new registrants faced lines of up to five hours today and were *likely* dissuaded from voting." (Emphasis added.) The circuit court appears to have overlooked the black letter law that "[a]rguments or statements made by counsel during argument are not to be considered or given weight as evidence." *See **Merco Distrib. Corp. v. O & R Engines, Inc.**, 71 Wis. 2d 792, 795-96, 239 N.W.2d 97 (1976).

¶69    All that said, even if an elector or electors had been discouraged due to long lines, the circuit court still would not have had equitable authority for its order, because said elector or electors would have already been afforded the same opportunity to vote as any other elector in the state.  As indicated, the court's order granted electors at these particular polling places greater opportunity to vote than any other electors in the state.  Rather than remedy an inequity, the court's order created one.

¶70    For its decision, the circuit court relied in part on "an informational memorandum" of the Wisconsin Elections Commission that the court said "states as follows, … [WIS. STAT. §] 6.96 provides for an extension of voting hours by court order.  While the statute refers to a federal court order, Wisconsin circuit courts have regularly determined that they have the inherent jurisdiction and authority to issue such orders."[11]  As the RNC points out, "no party cited, argued, or submitted any such 'informational memorandum.'"  Moreover, neither this WEC memorandum nor the circuit court identified *any* court that had previously "issue[d] such [an] order," much less any precedential case law support for the court's extension of the voting hours.[12]

---

[11] As is evident from our earlier discussion, *supra* ¶¶53-58, controlling precedent makes clear that "inherent authority" refers to a court's ability to administer the court system itself, which was not at issue in the matter before the circuit court on November 5, 2024.

[12] We do observe, however, that the WEC memorandum references a "municipality" seeking an extension of time for polls to be open due to "an emergency situation, inclement weather or flooding that obstructs traffic or access to the polling place, or a power outage could cause a polling place to close for a period of time….  If an extension of voting hours is necessary, it is the responsibility of *the municipality* to seek a court order authorizing an extension."  WISCONSIN ELECTIONS COMMISSION, *Court Document Templates for Extension of Polling Hours*, (Oct. 12, 2018), https://elections.wi.gov/memo/court-document-templates-extension-polling-hours  (last visited July 20, 2026) (emphasis added).  In this case, it was the partisan DNC seeking a reopening of the polls and extension of voting hours, not the presumably nonpartisan municipality.  Furthermore, there was no "emergency" situation remotely akin to those referenced by the memorandum.

¶71    Referring to this memorandum, the DNC writes: "To the extent the RNC challenges the WEC guidance the [circuit] court cited, this challenge is an improper collateral attack on agency guidance and should be dismissed."  The DNC's point is a red herring, as the RNC has not made any arguments suggesting it is collaterally attacking this memorandum.  Rather, the RNC merely appeals the *circuit court's* ruling interpreting and applying WIS. STAT. §§ 6.78 and 6.96 and the court's determination that, under the circumstances of this case, it had authority to extend voting past the time limit identified in § 6.78.  To the extent the memorandum conflicts with our decision herein, such guidance is simply in error, and future WEC memorandums will no doubt be corrected to reflect this decision.  But regardless, an informational memorandum from WEC does not trump the plain language of the statutes nor our decision herein.  *See Jefferson*, 394 Wis. 2d 602, ¶13 ("Although the WEC has issued official guidance, we interpret [WIS. STAT.] § 6.86(2)(a) without deference to the agency's interpretation."); *Service Emps. Int'l Union, Local 1 v. Vos (SEIU)*, 2020 WI 67, ¶100, 393 Wis. 2d 38, 946 N.W.2d 35 *overruled in part by Evers v. Marklein*, 2025 WI 36, ¶36, 417 Wis. 2d 453, 22 N.W.3d 789 ("[A] guidance document does not have the force or effect of law."); *see also SEIU*, 393 Wis. 2d 38, ¶102 ("[Guidance documents] impose no obligations, set no standards, and bind no one….  Functionally, and as a matter of law, they are entirely inert.").

¶72    The *Breier* court reversed the orders expunging the juvenile records because "there [was] no violation of rights."  130 Wis. 2d at 392.  Similarly, here, "no violation of rights" was shown to have occurred at either of these two polling places; the DNC did not establish that any electors actually were deprived of their right to vote.

¶73    Notably, while there was no evidence that any elector actually "gave up … because of the long lines" and left the polling location without voting, even if there had been such evidence, the circuit court's order was in no way limited to affording *only such voters* the ability to vote past 8:00 p.m.  Instead, the court extended the voting hours carte blanche at those two polling places, allowing any and all electors assigned to vote at those polling places—not just those who had come to the polls earlier in the day but abandoned their voting effort due to discouragement—to come to the polls and vote past the poll closing time to which electors from every other voting area in the state were limited.  Again, the court's order did not remedy an inequity; it created one.[13]

---

[13]  Notably, the legislature did not overlook the possibility of true emergencies on election day.  It provided WIS. STAT. §§ 5.25 and 7.37(1).  Section 5.25(3)(a) states that "no polling place … may be closed to voters on election day unless … the governing body of the municipality makes a finding of emergency, both the [governing body] and the municipal clerk approve the closure, and the municipal clerk" notifies the public in the manner required by the statute and "[d]esignates a proper person who shall be stationed at or as near as possible to the closed location to notify all electors of the closure and of their new polling location."  And in emergencies arising before votes are received on election day, § 5.25(d) provides that "[n]othing in this subsection alters the authority of the election inspectors to adjourn to another location for voting on election day under [§] 7.37(1)."  And, § 7.37(1) provides:

> Whenever it becomes impossible or inconvenient to hold an election at the designated location, the inspectors, after assembling at or as near the designated polling place as practicable and before receiving any votes, may adjourn to the nearest convenient place for holding the election.  The inspectors shall make a proclamation of the move and a law enforcement officer or other proper person designated by the municipal clerk shall be stationed at or as near as possible to the place where the adjournment was made, to notify all electors of the place to which the election adjourned.  At the new location the inspectors shall immediately proceed with the election.

Thus, one would expect that any true emergencies affecting voting in a particular location on election day would be considered in light of the relevant municipality's actions or failure to act with regard to that emergency.

¶74 The legislature clearly recognized that long lines might occur on election day, and because of this, provided a solution—all persons in line at 8:00 p.m. may lawfully vote, no matter how long that might take. *See* WIS. STAT. § 6.78(4). But, as previously noted, the legislature also provided that no one may enter the line after 8:00 p.m. And, again, the legislature was not just gently suggesting that the right to vote in any particular election ends when the polls across the state close at 8:00 p.m. on election day; it meant it. So much so, that in WIS. STAT. § 7.37(13), the legislature directed that the municipal clerk shall designate an official "who shall position himself or herself at the end of the line of individuals waiting to vote, if any, at the time that the polls officially close" and "*[o]nly individuals in line ahead of the official shall be permitted to vote under [§] 6.78(4)*." (Emphasis added.) The legislature meant what it said and said what it meant; the polls close at every polling place in the state at 8:00 p.m. on every election day, and the casting of votes ends at that time except for those electors who are already in the voting line at 8:00 p.m.

## CONCLUSION

¶75 In *League of Women Voters of Wisc. Educ. Network, Inc. v. Walker*, 2014 WI 97, 357 Wis. 2d 360, 851 N.W.2d 302, our supreme court emphasized that it is the role of the legislature, not the courts, to establish the time and manner for elections in the state when it reiterated that "'the legislature has the constitutional power to say how, when, and where' elections shall be conducted." *Id.*, ¶24 (quoting *State ex rel. Frederick v. Zimmerman*, 254 Wis. 600, 613, 37 N.W.2d 473 (1949)). The circuit court here had no authority to usurp the legislature's provision that the polls close at 8:00 p.m. all across the state and for every election, including for the November 5, 2024 election. Accordingly, we reverse its order reopening the University Center and Armory polling locations and extending the voting hours.

40

*By the Court.*—Order reversed.[14]

Recommended for publication in the official reports.

---

[14] We reverse the order of the circuit court, but because the case is otherwise moot, we do not remand.

No.  2024AP2484 (C)

¶76  NEUBAUER, P.J., (*concurring*). I concur with the majority's mandate reversing the circuit court order. I agree that, although moot, this case should be addressed. Here, the court erroneously exercised its discretion when extending the voting hours due to administrative delays in light of the facts presented. However, it is critical that we also clarify that, while the legislature is entrusted with setting the time, place, and manner of elections, the applicable polling hours statutes are not immutable: extraordinary or emergency circumstances can support extension of polling hours when these statutes are applied in violation of the electors' constitutional right to vote. *See League of Women Voters of Wisc. Educ. Network, Inc. v. Walker*, 2014 WI 97, ¶19, 357 Wis. 2d 360, 851 N.W.2d 302 (stating that voting is a right, not a privilege, which is guaranteed by WIS. CONST. art. III, § 1).[1]

## DISCUSSION

### I. Mootness

¶77  I agree with the majority's determination that this matter is moot. Majority, ¶7. The results of the November 2024 election have been certified and were unchallenged. It is agreed that any additional ballots had no impact on the outcome of the election both as to the referenda and the elected officials. The decision in this case will not change the results.

---

[1] WISCONSIN CONST. art. III, § 1 was amended in 2024, and it now reads: "Only a United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district who may vote in an election for national, state, or local office or at a statewide or local referendum." WIS. CONST. art. III, § 1(2).

¶78 I also agree that this matter is worthy of review. It appears that the extension of voting hours due to delays is an issue that is likely to recur, given that three efforts were made in Wisconsin circuit courts to extend voting hours in the November 2024 election. While ballots were marked and an after-the-fact appeal is available (I concur that laches does not bar this appeal), I agree that it is important to decide this case to avoid future uncertainty.

## II. INJUNCTIVE RELIEF

¶79 The Wisconsin Supreme Court has long recognized the fundamental nature of the constitutional right to vote, calling it "a sacred right of the highest character[.]" *State ex rel. McGrael v. Phelps*, 144 Wis. 1, 15, 128 N.W. 1041 (1910). "Nothing can be clearer under our Constitution and laws than that the right of a citizen to vote is a fundamental, inherent right." *State v. Circuit Ct. for Marathon Cnty.*, 178 Wis. 468, 190 N.W. 563, 565 (1922) (citing *State ex rel. McGrael*, 144 Wis. at 15). "It is a right which has been most jealously guarded and may not under our Constitution and laws be destroyed or even unreasonably restricted." *Id.* The right to vote is fundamental; it is the "essence of a democratic society[.]" *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). It is the right that preserves all others. *Id.*; *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "[T]he right to vote is the most protected of rights." *League of Women Voters*, 357 Wis. 2d 360, ¶73 (Abrahamson, C.J., dissenting).

¶80 The Wisconsin Supreme Court, and by extension all state courts, have "a duty to enforce the rights protected under the Wisconsin Constitution." *A.M.B. v. Circuit Ct. for Ashland Cnty.*, 2024 WI 18, ¶37, 411 Wis. 2d 389, 5 N.W.3d 238 (R. Bradley, J., concurring). The United States Supreme Court recently affirmed that our state courts are charged with ensuring our state constitution's right to vote;

2

the court stated, "[n]othing in [the Elections] Clause instructs, nor has this Court ever held, that a state legislature may prescribe regulations on the time, place, and manner of holding federal elections in defiance of provisions of the State's constitution." *Moore v. Harper*, 600 U.S. 1, 26 (2023) (alteration in original; quoting *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 817-18 (2015)).

¶81 Our supreme court has also made clear that "legislation on the subject of elections is within the constitutional power of the Legislature so long as it merely regulates the exercise of the elective franchise, and does not deny the franchise itself either directly or by rendering its exercise so difficult and inconvenient as to amount to a denial." *State ex rel. Van Alstine v. Frear*, 142 Wis. 320, 341, 125 N.W. 961 (1910).

¶82 And, as the majority recognizes, our courts have authority to exercise equitable authority when required to respond "to the invasion of legally protected rights." Majority, ¶¶61-62 (quoting *Breier v. E.C.*, 130 Wis. 2d 376, 389, 387 N.W.2d 72 (1986)). If there is a wrong, the exercise of equitable authority "may provide complete justice[.]" *Id.*

¶83 Thus, the question presented here is whether the circuit court erroneously exercised its discretion in determining that extraordinary circumstances causing delays violated the voters' core constitutional right to vote, guaranteed under WIS. CONST. art. III, § 1.

¶84 I agree that the applicable statutes did not authorize the extension of voting hours beyond 8:00 p.m. by the circuit court *under the facts presented here*.

3

¶85    WISCONSIN STAT. § 6.78(1m) provides: "[t]he polls at every election shall be open from 7 a.m. until 8 p.m." WISCONSIN STAT. § 6.78(4) provides: "[a]ny elector waiting to vote, whether within the polling booth or in the line outside the booth at the time the polls officially close, shall be permitted to vote."

¶86    WISCONSIN STAT. § 7.37(13) provides:

> the municipal clerk[2] shall designate an official … who shall position himself or herself at the end of the line of individuals waiting to vote, if any, at the time that the polls officially close. … Only individuals in line ahead of the official shall be permitted to vote under [§] 6.78(4).

These statutes provide that only those electors who are already in line outside the booth to vote when the polls close at 8:00 p.m. are permitted to vote.

¶87    I also agree that under the thin facts provided at the hearing, the circuit court erroneously exercised its discretion when it determined that extraordinary circumstances supported an extension of the voting hours. As the majority details, there was not sufficient evidence to show that electors at the two locations had been deprived of their constitutional right to vote. Like the two other Wisconsin circuit court cases the majority cites, the facts did not support an extension because there

---

[2] Under state law, municipal clerks have "charge and supervision of elections and registration" and are given broad duties including "any [duties] which may be necessary to properly conduct elections[.]" WIS. STAT. § 7.15(1). County clerks also play a crucial role in conducting elections, including preparing and providing ballots and election supplies for all "national, state and county elections[.]" WIS. STAT. § 7.10(1)–(2).

4

was no showing that the delays denied the electors' constitutional right to vote.[3] *See* Majority, ¶¶21-23.

¶88 I read the majority's decision (and my concurrence) to be limited to the facts of this case. In other circumstances, however, the polling hour statutes cannot be applied to violate the constitutional right to vote set forth in WIS. CONST. art. III, § 1(2): these statutes must be flexible—when their application would infringe on electors' right to vote.[4]

¶89 The majority does identify the statutory authority to move a polling location in the event of an emergency, which both recognize that emergencies can happen and provides our state courts with authority to ensure that the statutes are properly followed to protect the right to vote. Majority, ¶73 n.12, citing WIS. STATS. §§ 5.25 and 7.37(1).[5]

---

[3] The majority cites two other Wisconsin circuit court decisions from the November 2024 election in which the circuit courts found extensions were unnecessary to protect the right to vote. Majority, ¶¶21-23. In the Dunn County case, *Democratic National Committee v. Martin*, No. 24CV245 (Dunn Cnty. Cir. Ct. Nov. 5, 2024), counsel for the city stated that the election clerk believed that she had adequate staff. Majority, ¶22. Counsel for the RNC argued that, if the polls had not been closed, the court could extend the hours, but only in "extraordinary circumstances." *Id.* The court denied the request because the delays were not "extraordinary[.]" *Id.* In *Democratic National Com[m]ittee v. Bartlett*, No. 24CV1040 (Winnebago Cnty. Cir. Ct. Nov. 5, 2024), the clerk's notes indicate that the court denied the request because it was filed after the polls had already closed. *Id.*

[4] Notably, the court in *Southerland v. Fritz*, 955 F. Supp. 760 (E.D. Mich. 1996), a case discussed by the majority, the court did not consider the state's constitutional right to vote. Similarly, the court in *Republican Party of Arkansas v. Kilgore*, 98 S.W.3d 798 (Ark. 2002), did not consider the state's constitutional right to vote.

[5] Consistent with these statutes, a polling location was moved after shots were fired in the area. *Wisconsin village moves voting after gunshot closes polls,* ASSOCIATED PRESS (Feb. 21, 2023), https://apnews.com/article/wisconsin-brooklyn-992fdca6c74448ebf43114714e7ff7ee/ (last visited July 15, 2026); Sierra Rehm, *Incident in village of Brooklyn began because of dispute over tree removal*, WKOW (Feb. 21, 2023), https://www.wkow.com/news/state/incident-in-village-of-brooklyn-began-because-of-dispute-over-tree-removal/article_f18cc7a0-b1f5-11ed-b357-9b932a55ea8f.html (last visited July 15, 2026).

¶90 In instances involving extraordinary or exigent circumstances which do not require relocation, our state courts properly can and have exercised equitable authority to extend voting hours to protect electors' constitutional right to vote. A circuit court extended the voting hours by 90 minutes, finding the circumstances were "extraordinary" when electors were incorrectly advised that the designated site was not a polling location and signs were removed.[6] In that case, evidence was submitted by affidavit and testimony at the hearing to substantiate the claim and that voters did leave. In April 2025, the Marathon County clerk and Village of Kronenwetter clerk requested, and the court granted, a one-hour extension of voting hours after technology issues caused significant delays and long lines that led some voters to leave without casting a ballot.[7] An extension of one hour was also granted when there was a bomb scare in Madison, Wisconsin and the polling station was closed for 90 minutes.[8]

¶91 One can envision many other extraordinary scenarios that would preclude access to polling locations, such as severe weather, technical difficulties, an active shooter, or other obstructions to the polling location. Under extraordinary

---

[6] *In re Petition of Maribeth Witzel-Behl*, No. 2024CV976 (Dane Cnty. Cir. Ct. Apr. 2, 2024); Jessie Opoien and Hope Karnopp, *Why a Wisconsin voting site in Madison stayed open 90 minutes past the closing of the polls*, MILWAUKEE J. SENTINEL (Apr. 2, 2024), https://www.jsonline.com/story/news/politics/elections/2024/04/02/why-a-madison-polling-site-stayed-open-90-minutes-past-closing-time/73186768007 (last visited July 15, 2026).

[7] *Marathon County Clerk v. Village of Kronenwetter*, No. 2025CV216 (Marathon Cnty. Cir. Ct. Apr. 1, 2025); Erik Pfantz, *Village of Kronenwetter voting hours extended to 9 p.m. due to "technical issues"*, WAUSAU DAILY HERALD (Apr. 1, 2025), https://www.wausaudailyherald.com/story/news/politics/elections/2025/04/01/kronenwetter-voting-hours-extended-to-9-p-m-due-to-technical-issues/82764915007/?gnt-cfr=1&gca-cat=p&gca-uir=false&gca-epti=z113920p003950c003950e000200v113920&gca-ft=235&gca-ds=sophi (last visited July 15, 2026).

[8] Lynn Heidmann, *Bomb threat interferes with city polling place*, BADGER HERALD (Nov. 8, 2006), https://badgerherald.com/news/2006/11/08/bomb-threat-interfer/ (last visited July 15, 2026).

circumstances, WIS. STATS. §§ 6.78(1m), (4) and 7.37(13), must give way when it is properly shown that the 8:00 p.m. poll closing time is in conflict with electors' constitutional right to vote.[9]

¶92 The guidance from the Wisconsin Elections Commission appropriately advises municipal clerks that it is their responsibility to seek an extension in state court if a polling location is closed "for a significant period of time, especially during the afternoon or evening hours[.]"[10] The WEC memorandum directs municipal clerks to seek an extension of time for polls to be open due to "an emergency situation, inclement weather or flooding that obstructs traffic or access to the polling place, or a power outage could cause a polling place to close for a period of time."[11] The guidance appropriately recognizes that relief is available when extraordinary circumstances violate electors' right to vote. Notably, the majority appropriately distinguishes this case from the exigent circumstances contemplated in the scenarios discussed in the Wisconsin Election Commission's

---

[9] The majority discusses *State ex rel. Bush-Cheney 2000 v. Baker*, 34 S.W.3d 410 (Mo. Ct. App. 2000), suggesting that the statutory closing hours deprive the courts of "jurisdiction." *See* Majority, ¶¶25-27. Not so. The same court subsequently held that extending voting hours was permissible to protect the right to vote. *See St. Louis Cnty. Bd. of Elec. Comm'rs v. McShane*, 492 S.W.3d 177, 182 (Mo. Ct. App. 2016). The *McShane* court held that the statute designating the hours of voting at polling places was directory, not mandatory, and it violated the electors' constitutional right to vote as applied to voters who were unable to vote during the designated time due to unavailability of ballots. *Id.* The *McShane* court noted that in *Baker*, there was no showing that voters were disenfranchised. *Id.* at 183; *see also Kilgore*, 350 Ark. at 542 (stating that the record revealed that no testimony was taken and no evidence was presented in support of the allegations made in the petition, and no parties other than the petitioners were notified of the hearing). Similarly, in *Southerland* there was no evidence that voters were unable to vote or to wait in line as a result of voting machine difficulties. 955 F. Supp. at 762. The voters could wait in line and emergency ballots could be provided. *Id.*

[10] WISCONSIN ELECTIONS COMMISSION, *Court Document Templates for Extension of Polling Hours*, (Oct. 12, 2018), https://elections.wi.gov/memo/court-document-templates-extension-polling-hours (last visited July 20, 2026).

[11] *See supra* note 10.

guidance when there is a closure of a polling location for a significant period of time. Majority, ¶70 n. 11.[12]

¶93 As the majority also notes, WIS. STAT. § 6.96 acknowledges that a federal court has authority to extend voting after 8:00 p.m., by detailing the procedures for official handling of an elector's ballot "[w]henever any elector is allowed to vote at a polling place pursuant to a federal court order after the [8:00 p.m.] closing time provided under [WIS. STAT. §] 6.78." This statute does not preclude our state courts from extending hours when there are extraordinary circumstances or in an emergency, when electors' constitutional right to vote is at issue.

¶94 Federal jurisdiction may not always be available if, for example, there is not a federal election candidate on the ballot. As the municipal clerk for the city of Madison details in an *amicus* brief, the logistics of seeking federal court protection in short order for unforeseen extraordinary or emergency circumstances could severely curtail the ability to seek and obtain timely relief as a practical matter. There are only 3 federal district court locations in Wisconsin, some situated far from many of our 72 counties, each of which county has a circuit court and a "duty" judge available for precisely these types of exigent circumstances. The state statutory reference to federal courts does not curtail the equitable authority of our state courts to protect the state constitutional right to vote.

¶95 Lastly, I write separately to address the majority's discussion when analyzing the appropriateness of review. While I agree that this is an issue of great

---

[12] In the appellant's brief, the Republican National Committee also recognizes that extraordinary circumstances do occur, and explicitly acknowledges relief is available when there are "[e]xtreme [c]ircumstances that [c]learly [i]nfringe on [o]ne's [r]ight to [v]ote."

public importance, the majority opinion unnecessarily questions the efforts to ensure access to the ballot as undermining the integrity of the election and our electoral process. The right to vote guaranteed by Article III, Section 1 of the Wisconsin Constitution is a fundamental right. *League of Women Voters*, 357 Wis. 2d 360, ¶19.

¶96 Here, it appears that the local election officials had not adequately prepared to update registrations, resulting in an allegation that hundreds of people waited in line. If so, it is predictable that electors would not prepare for five hours of waiting and that some would be unable to stay due to work, school, family responsibilities, or because a physical disability prevented them from standing in line for hours. November 2024 was obviously going to be a high-turnout election. That new and updated registrations would be required in these heavily student-based locations was foreseeable by the local election officials. The suggestion that efforts seeking to afford access to the fundamental right to vote involved some sort of untoward gamesmanship or undermines the integrity of our electoral process is not necessary to this decision.

¶97 Here, the circuit court expressed the intent to err on the side of caution by seeking to protect electors' constitutional right to vote by ensuring ballot access, which could not be replicated and thus potentially risked irreparable harm. The court also required that the ballots were identifiable and preserved so that the court's decision could be challenged if the heat-of-the-moment judgment call as to whether extraordinary circumstances had been established, or not, was wrong.

¶98 I fear that the majority joins the cacophony of those who suggest that our elections are fraught with problems and subject to manipulation, such that the integrity of our elections was at stake in this case, and more generally, that the

integrity of our electoral process was also called into question. In our country, there are regular unfounded allegations of voter fraud, election denial, and conspiracy theories. Unfounded allegations breed voter distrust and cynicism, undermining the integrity of our elections in the minds of the electorate.

¶99 We do not need to add fuel to the fire. The extension of voting hours at these two polling locations was inconsequential to the election in Wisconsin. There was no vote dilution or vote pollution. There was no legal-political circus or national to-do. The facts at issue provide no reason to see this case as one giving rise to alarm over the integrity of our elections. The proper avenue for a challenge was brought to this court, and we have provided an answer. There is no reason to present this case as yet another example of shady business that should make us wary of our electoral process.

## CONCLUSION

¶100 The polling hour statutes cannot be applied to violate the constitutional right to vote: these statutes must be flexible—when their application would infringe on electors' right to vote. Here, I join the majority's mandate *given the facts of this case*: the circuit court erroneously exercised its discretion in determining that extraordinary circumstances caused delay that violated the voters' constitutional right to vote.